1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**
9                 **SOUTHERN DISTRICT OF CALIFORNIA**
10

11   KATHLEEN COYNE,                          CASE NO. 08-CV-639 JLS (CAB)

12                           Plaintiff,        **ORDER DENYING**
                                               **DEFENDANT'S MOTION FOR**
13        vs.                                  **SUMMARY JUDGMENT**

14   COUNTY OF SAN DIEGO,                      (Doc. No. 30)

15                           Defendant.

16
17         Kathleen A. Coyne ("Plaintiff") has been a Deputy Public Defender for the County of San

18   Diego since 1989.  Plaintiff sued the County of San Diego[1] ("Defendant") in state court on February

19   29, 2008, alleging unlawful sex discrimination pursuant to Cal. Gov't Code § 12940(a); unlawful

20   retaliation pursuant to Cal. Gov't Code § 12940(h); and unlawful retaliation pursuant to 42 U.S.C. §

21   2000e-3(a).  (Doc. No. 1.)   This employment discrimination action was properly removed to this

22   Court on April 8, 2008. (Doc. No. 1.) Defendant filed its answer on April 17, 2008 and subsequently

23   filed the present motion for summary judgment on July 28, 2009.  (Doc. No. 30.)  Plaintiff filed her

24   opposition to the motion on October 22, 2009.  (Doc. No. 37.)  Defendant filed its reply on November

25
26         [1] Plaintiff also named the County's Department of the Public Defender as a Defendant in the
     action.  The County contended in its brief that the Department of the Public Defender is a non-
27   independent, subsidiary entity of the County with no separate identity, and thus is not a proper
     defendant.  (Mem. ISO MSJ at 4 n.4 (citing Cal. Gov't Code §§ 27700-08).)  At oral argument,
28   Plaintiff agreed.  Thus, the only remaining Defendant in this action is the County of San Diego and
     all actions will be attributed only to the County.

5, 2009.  (Doc. No. 39.)  The Court heard oral argument on December 10, 2009 and took the matter under submission.  For the reasons stated below, the Court **HEREBY DENIES** Defendant's motion for summary judgment.

### FACTUAL BACKGROUND

Plaintiff became a Deputy Public Defender ("DPD") in 1989.  (Compl. ¶ 10.)  There are five levels of seniority in the classified service for DPDs, and Plaintiff was promoted to the most superior level –  Level V – by then-Public Defender Steven Carroll in late 1997 or 1998.  (Carroll Decl. ¶ 6.)  At this time, Plaintiff worked in the El Cajon branch of the Department.  She never held an official "supervisory" position, despite her qualification to do so as a DPD Level V ("DVD V") and repeated requests by Plaintiff to do so.  (*See* County Ex. 6, p. 11; Coyne Decl. ¶¶ 2, 3.)

In May of 2005, Attorney Bill Richardson was assigned to one of several available supervisory positions.  Mr. Richardson was a DPD IV, one level lower that Plaintiff's status.  (Coyne Decl. ¶ 3.)  This assignment made Mr. Richardson Plaintiff's supervisor.  Plaintiff was disappointed that she had been passed over for this position; in fact, she was not even interviewed for the position.  (Coyne Depo. at 306-07.)

In March of 2006, several vacancies allowed Public Defender Steven Carroll (the "Public Defender") to promote a number of DPDs to DPD IV and PDP V status.  (Carroll Decl. ¶ 4.)  Mr. Richardson was one of the candidates for such a promotion.  (Coyne Decl. ¶ 10.)  The Public Defender initially had nine DPD IV and five DPD V vacancies.  (Carroll Decl. ¶ 4.)  However, the Public Defender asked the County for permission to increase the number of promotional vacancies, and the County gave the Public Defender authority to promote twenty DPD IVs and fourteen DPD Vs.  (Carroll Decl. ¶¶ 4, 5, Ex. 1.)  The promotions were announced on November 20, 2006, effective January 2007.  Fourteen candidates - 12 men and 2 women - were promoted to DPD V.  (Brown Decl. ¶ 3.)  Mr. Richardson was one of the men promoted to DPD V.  (Brown Decl. ¶ 4.)

Within days of the announced promotions, the County began getting complaints of gender discrimination, and several unsuccessful female applicants filed gender discrimination claims with the County Civil Service Commission and in Superior Court.  (*See* Carroll Decl. ¶ 6; County Ex. 3

at 15, ¶ 19; Brown Decl. ¶ 5.)  Plaintiff actively supported the women's appeal and later spoke at a meeting of the "Commission on the Status of Women" on March 7, 2009. (Compl. ¶ 15; Mem. ISO MSJ at 2 n.1; Coyne Decl. ¶ 13.)  Defendant concedes that Plaintiff's "support to co-workers bringing a discrimination claim constitutes a protected activity under Title VII [of the Civil Rights Act] and FEHA [California's Fair Employment and Housing Act]."

For reasons much in dispute, and thoroughly discussed below, Plaintiff was informed on April 12, 2007 that she would be transferred from the El Cajon branch to the Juvenile Delinquency branch, which is geographically the next closest Public Defender's office.  (Carroll Decl. ¶ 16; Coyne Decl. ¶ 18.)  The transfer was made public on April 13, 2007, and Plaintiff was one of twenty other DPDs transferred in April 2007.  (Carroll Decl. Exs, 8, 9.)  This transfer is the basis for Plaintiff's sex discrimination and retaliations claims, as set forth in her Complaint.[2]  (*See* Compl. ¶¶ 16, 22, 29, 35.)

There are other incidents that occurred prior to and throughout the litigation which become an issue in this case.  I will describe them here and will reference these incidents below.  One incident was between Plaintiff and Mr. Lucero, El Cajon's Chief Investigator. Lucero's declaration describes the alleged incident, which was documented several months before the transfer and before Plaintiff attended the Commission on the Status of Women meeting.  (*See* Lucero Decl. Ex. A.)  Essentially, Mr. Lucero states that he "experienced a number of incidents in late 2006 and early 2007 in which Plaintiff was confrontational or disrespectful towards [him]."  (Lucero Decl. ¶ 3.)  One particular incident, documented in an e-mail to his supervisor, *see* Lucero Decl. Ex. A, involved Ms. Coyne bypassing the system within the office requesting the investigators to deliver packages.  (*Id.*)  Mr. Lucero contended in the e-mail that Plaintiff was "disrespectful," "confrontational," "condescending" and "negative."  (*See* Lucero Decl. Ex. A.)

Another relevant incident involved Mr. Richardson, a fellow attorney in the El Cajon branch who was selected for the branch Supervisor position in the El Cajon branch over Plaintiff.

---

[2]  Plaintiff, however, further contends that there was ongoing retaliation, as illustrated by a Letter of Reprimand (later changed to a Letter of Warning) issued by the Pubic Defender for a controversial motion she filed to disqualify a Superior Court judge.  (*See* Opp. to MSJ at 12.)  This is discussed below.

(Coker Decl. ¶¶ 3-4; *see also* Pl. Depo. at 307-08.)  Plaintiff admits that she believes Mr.
Richardson is incompetent in the role of Supervisor and believed she was more qualified to serve
as Supervisor.  (Pl. Depo. at 288-89; 307-08.) The Chief Deputy overseeing branch operations, Mr.
Coker, "would periodically hear reports from the El Cajon branch that [Plaintiff] was undermining
Bill Richardson's authority as the branch Supervisor." (Coker Decl. ¶ 6.)  One incident in
particular involving Mr. Richardson occurred on March 22, 2007.  On or about this date, Plaintiff
received a copy of an Order from a district court concluding that Mr. Richardson rendered
ineffective assistance of counsel in a case he handled in 1997.  (Pl. Depo. at 286-287; *see also* Pl.
Ex. C.)  Plaintiff disseminated this Order to her colleagues (Pl. Depo. at 286-87), but the reason
why is in dispute and discussed more below.

The third incident occurred after the Complaint had been filed in this case.  On or about
November 8, 2008, Plaintiff filed a motion in San Diego Superior Court to disqualify Judge Parsky
from a case in which Plaintiff was assigned as the defender.  (*See* Carroll Decl. Ex. 8.)  "Without
explanation, after the motion was filed [Plaintiff] was taken off the case and the motion was
withdrawn." (Coyne Decl. ¶ 36.) On March 26, 2009, Mr. Carroll issued a formal Letter of
Reprimand to Plaintiff involving this motion.  (*Id.*)  The Letter of Reprimand points to several
errors on the face of plaintiff's moving papers – errors Mr. Carroll believed fell "short of the
quality of work expected of a Deputy Public Defender V in numerous ways." (*Id.*)  Mr. Carroll
"was particularly concerned with the numerous personal attacks made against the judge."  (Mem.
ISO MSJ at 16; Carroll Decl. ¶ 18.)  Mr. Carroll felt that the facts in her brief and declaration did
not support the accusations she made against the judge.  (*Id.*)  This Letter of Reprimand was later
"changed to a letter of warning which, from [Plaintiff's] understanding, means there is no method
by which [she] can appeal its presence in [her] personal file." (Coyne Decl. ¶ 14.)

## LEGAL STANDARDS

### A.    Motion for Summary Judgment

Summary judgment is properly granted when "there is no genuine issue as to any material
fact and . . .  the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).
Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient

to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party moving for summary judgment bears the initial burden of establishing an absence of a genuine issue of material fact.  *Id.* at 323.  Where the party moving for summary judgment does not bear the burden of proof at trial, it may show that no genuine issue of material fact exists by demonstrating that "there is an absence of evidence to support the non-moving party's case."  *Id.* at 325.

Once the moving party meets the requirements of Rule 56, the burden shifts to the party resisting the motion, who "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  Without specific facts to support the conclusion, a bald assertion of the "ultimate fact" is insufficient.  *See Schneider v. TRW, Inc.*, 938 F.2d 986, 990-91 (9th Cir. 1991).  A material fact is one that is relevant to an element of a claim or defense and the existence of which might affect the outcome of the suit.  The materiality of a fact is thus determined by the substantive law governing the claim or defense.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Anderson*, 477 U.S. at 248).  When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] . . . ruling on a motion for summary judgment."  *Anderson*, 477 U.S. at 255.

**B.      Plaintiff's Causes of Action**

Plaintiff's first cause of action alleges sex discrimination in violation of Cal. Gov't Code § 12940(a), California's Fair Employment and Housing Act ("FEHA").  Section 12940(a) makes it unlawful for an employer "to discriminate against [a] person in the terms, conditions, or privileges of employment" based on the employee's sex.

Both Title VII of the Civil Rights Act of 1964 ("Title VII") and California's Fair

1   Employment and Housing Act ("FEHA") make it an unlawful employment practice for an

2   employer to retaliate against an employee who performed a protected activity.  FEHA makes it

3   unlawful for "an employer . . . to discharge, expel, or otherwise discriminate against any person

4   because the person has opposed any practices forbidden under this part, or the person has filed a

5   complaint, testified, or assisted in any proceeding under this part." Cal. Gov't Code 12940(h).

6   Title VII makes it "unlawful . . . for an employer to discriminate against any . . . employee[] . . .

7   because he has opposed any practice made an unlawful employment practice by this subchapter, or

8   because he had made a charge, testified, assisted, or participated in any manner in an investigation,

9   proceedings, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

10      The plaintiff in an FEHA sex discrimination suit bears the initial burden of proving the

11  elements of a prima facie case of discrimination.  Though the specific elements may vary,

12  "[g]enerally, the plaintiff must provide evidence that (1) he was a member of a protected class, (2)

13  he was qualified for the position sought . . . (3) he suffered an adverse employment action, such as

14  . . . denial of an available job, and (4) some other circumstances suggests discriminatory motive."

15  *Guz v. Bechtel Nat'l*, 24 Cal.4th 317, 334 (2000).

16      In a FEHA and Title VII[3] retaliation lawsuit, the plaintiff bears the initial burden of

17  establishing her prima face case of retaliation.  Plaintiff must show "he engaged in a protected

18  activity, his employer subjected him to adverse employment action, and there is a causal link

19  between the protected activity and the employer's action." *Flait*, 3 Cal. App. 4th at 476; *see also*

20  *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1464 (9th Cir. 1994); *Guz*, 24 Cal.4th at 355.

21      In both discrimination and unlawful retaliation cases, if the plaintiff meets the burden of

22  proving its prima facie case, a rebuttable presumption of discrimination arises and the defendant

23  must then "articulate a legitimate nonretaliatory explanation for its acts." *Flait*, 3 Cal. 4th at

24  476; *see also Johnson v. United Cerebral Palsy/Spastic Children's Foundation*, 173 Cal. App. 4th

25  740, 754-55 (2009).  In this determination, the employer's "true reasons need not necessarily have

26  been wise or direct **. . . ,** the ultimate issue is whether the employer acted with *a motive to*

27  ───────────────────

28      [3]  "Lawsuits claiming retaliatory employment termination in violation of []FEHA are analogous to federal 'title VII' claims . . . and are evaluated under federal law interpreting title VII cases." *Flait v. North Am.Watch Corp.*, 3 Cal. App. 467, 476 (1992).

1   discriminate illegally.  Thus, 'legitimate' reasons . . . are reasons that are facially unrelated to

2   prohibited bias, and which, if true, would thus preclude a finding of discrimination.**"** *Guz*, 24

3   Cal.4th at 358 (emphases omitted).

4          After the defendant has rebutted the presumption of discrimination by proffering legitimate

5   nonretaliatory reasons for its actions, the burden then shifts back to the employee "to show that the

6   defendant's proffered explanation is merely a pretext for the illegal [action]." *Flait*, 3 Cal. App.

7   4th at 476; *see also Johnson*, 173 Cal. App. 4th at 755; *Brooks v. City of San Mateo*, 229 F.3d 917,

8   928 (9th Cir. 2000).

9                                          **DISCUSSION**

10          For the purposes of the motion for summary judgment, Defendant concedes that Plaintiff

11   engaged in a protected activity, which was "her support for her colleague who were claiming that

12   the 2006-07 promotion were gender-biased."  (Mem. ISO MSJ at 6.)  Defendant also concedes that

13   the transfer Plaintiff alleges constituted retaliation was "in sufficient 'temporal proximity' to her

14   protected activity to infer causation."  (*Id.* at 6-7 (citing, e.g., *Clark County Sch. Dist. v. Breeden*,

15   532 U.S. 268, 273 (2001).)  Thus, the issues before this Court are whether Plaintiff has sufficiently

16   established that (1) her transfer was an "adverse employment action"; and (2) her transfer was

17   justified by legitimate non-discriminatory reasons.  There is also an underlying issue of whether

18   the Court may consider other actions undertaken by Defendant as evidence of retaliation or gender

19   discrimination, or just the transfer itself.

20   **I.      Was Plaintiff's Transfer an "Adverse Employment Action"?**

21          Both the gender discrimination and retaliation claims require that Plaintiff plead and prove

22   an "adverse employment action."  The relevant standard in employment discrimination and

23   retaliation claims is whether the action "materially affect[ed] the terms, conditions, or privileges of

24   employment."  *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal.4th 1028, 1060 (2005).  This determination

25   "is not, by its nature, susceptible to a mathematically precise test."  *Id.* at 1053-54.

26          Minor or relatively trivial adverse actions or conduct by employers or fellow employees
            that, from an objective perspective, are reasonably likely to do no more than anger or
27          upset an employee cannot properly be viewed as materially affecting the terms, conditions,
            or privileges of employment and are not actionable, but adverse treatment that is
28          reasonably likely to impair a reasonable employee's job performance or prospects for
            advancement or promotion falls within the reach of the antidiscrimination provisions of

1    sections 12940(a) and 12940(h).

2
3    *Id.* at 1055-56.

The United States Supreme Court has held that Title VII's anti-retaliation provision

4    "protects an individual not from all retaliation, but from retaliation that produced an injury or

5    harm." *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006).  Whether the

6    action is materially adverse depends on whether it is reasonably likely that the employee with be

7    deterred from engaging in protected activity.  *Id.* at 68-69.  The Court noted that "normally petty

8    slights, minor annoyances, and simple lack of good manners will not create such deterrence[,]" but

9    that "context matters." *Id.* at 68-69.  "Whether a particular assignment is materially adverse

10   depends on the circumstances of the particular case and should be judged from the perspective of a

11   reasonable person in the plaintiff's position considering all the circumstances." *Id* at 71.  This is

12   an objective standard.  *Id.* at 68.

13   The Ninth Circuit has repeatedly affirmed that adverse actions do not have to be severe:

14   "[A plaintiff] need not show that she was fired, demoted, or suffered some financial loss . . . [I]f a

15   transfer to a 'position was not made available . . . because of her involvement in protected

16   activities,' then she suffered an adverse employment decision." *McAlindin v. County of San*

17   *Diego*, 192 F.2d 1226, 1239 (9th Cir. 1999) (citing *Bouman v. Block*, 940 F.2d 1211, 1229 (9th

18   Cir. 1991)).  Further, the Ninth Circuit has found that "lateral transfers, unfavorable job references,

19   and changes in work schedules . . . are all reasonably likely to deter employees from engaging in

20   protected activity," and thus constitute adverse employment actions.  *Ray v. Henderson*, 217 F.3d

21   1234, 1243 (9th Cir. 2000).  Moreover, the Supreme Court affirmed that "retaliatory work

22   assignments . . . [are] a classic and widely recognized example of forbidden retaliation."

23   *Burlington Northern*, 548 U.S. at 71 (quotations omitted).

24   Defendant contends that, because "the transfer did not cause any loss of pay, benefits,

25   seniority, prestige or any other term or condition of employment," it did not amount to a materially

26   adverse employment action under the law.  (Mem. ISO MSJ at 9-10; *see also* Carroll Decl. ¶ 10.)

27   The Court disagrees.  Plaintiff has sufficiently established that the transfer was a materially

28   adverse employment action under the law which resulted in harm or injury.

First, Plaintiff has sufficiently established a genuine issue of material fact whether her assignment to Juvenile Delinquency constitutes a "retaliatory work assignment" because of the alleged perception that a transfer or assignment to Juvenile is less prestigious, unfavorable, and, in some cases, punitive.  Plaintiff contends that her transfer "was viewed by all as a transfer to a less prestigious position."  (Opp. to MSJ at 16; Coyne Decl. ¶ 41.)  Ms. Brown, another attorney who previously worked for the County's public defenders, declared that she believed Plaintiff's transfer was punitive in nature: "During my time in and associated with the Office of the Public Defender, transfer to Juvenile Delinquency was perceived and widely regarded by me and others as a form of punishment, as well as often a precursor for termination."  (Brown Decl. ¶ 6.)  Ms. Brown goes on to detail that, especially for senior deputies, such a transfer is considered punitive or a "virtual demotion."  (*Id.*)

Moreover, Plaintiff cites to Mr. Carroll's deposition in which he admitted that there was (at least at some point in time) a negative perception of Juvenile Delinquency in the county, state, and nationally.  (*See* Plaintiff Ex. HH, Carroll Depo. at 72, 74.)   Mr. Carroll, however, asserts that since around 1990, when he became Chief County Deputy, he has made efforts to change the other deputies' attitudes about Juvenile; for example, by assigning some of his top deputies there at some point in time (including Mr. Coker).  (*Id.* at 72.)  Thus, Defendant argues that even if a negative perception once existed, it no longer does and therefore Plaintiff's transfer could not have been an adverse employment action under this theory.

The Court appreciates Mr. Carroll's efforts to combat the alleged negative perception of a Juvenile Delinquency assignment in the County.  Unfortunately, there is no evidence in the record suggesting that such efforts produced the desired outcome.  To the contrary, both Plaintiff and Ms. Brown contend that such a perception still exists.  The issue at summary judgment is whether Plaintiff has produced sufficient evidence to create a genuine issue of material fact to be determined at trial.  Despite Mr. Carroll's assertions, there is evidence in the record sufficiently establishing such a genuine issue regarding the alleged negative perception of Plaintiff's transfer to Juvenile and whether this could be considered a "retaliatory work assignment" given that

1   alleged perception.[4]

2       Second, the Court agrees with Plaintiff that the transfer injured her capacity to care for her

3   disabled son, who suffers from a rare form of epilepsy.  (Opp. to MSJ at 16; *see also id.* at 2 n.2.)

4   The El Cajon branch was five minutes from her home, and thus her reassignment to Juvenile

5   required more travel and a longer commute, making it more difficult to care for her son.  (Coyne

6   Decl. ¶ 40.)  Though not controlling, the Seventh Circuit case of *Washington v. Illinois Dept. of*

7   *Revenue*, 420 F.2d 658 (7th Cir. 2005), is instructive.  In *Washington*, the Seventh Circuit reversed

8   and remanded the district court's grant of summary judgment.  The plaintiff in *Washington* was

9   reassigned to a new position which required her to work the hours of 9 a.m. to 5 p.m.  420 F.3d at

10  662.  Her previous position's supervisor allowed her to work from 7 a.m. to 3 p.m., which allowed

11  plaintiff to be home when her disabled son returned from school.  *Id.* at 659.  The court found that

12  the jury could reasonably find that the employer retaliated against the plaintiff, knowing of

13  plaintiffs "vulnerability: her son's medical condition.  Working 9-to-5 was a materially adverse

14  change for her, even though it would not have been for 99% of the staff."  *Id.* at 662.  Similarly,

15  the Supreme Court noted in *Burlington Northern* that a schedule change could be materially

16  adverse to one employee under the circumstances, though it may not be for other employees: "A

17  schedule change in an employee's work schedule may make little different to many workers, but

18  may matter enormously to a young mother with school age children." 548 U.S. at 68.

19      Plaintiff's situation is similar: the County knew Plaintiff needed to care for her disabled

20  son and that her position in El Cajon was particularly conducive to that need, yet arguably

21  retaliated against her by moving her to the less-conducive Juvenile branch.  (Opp. to MSJ at 16.)

22  Specifically, Plaintiff has a disabled son that requires Plaintiff's assistance at home in the

23  afternoons upon her son's return home from school.  This requires Plaintiff to leave the office

24  between the hours of 3:00 and 5:00 p.m. every day and every Wednesday at 1:30 p.m. (Carroll

25  Decl. Ex. 7.)  Plaintiff and her son reside in El Cajon, approximately 5 minutes from the El Cajon

26  _____

27      [4]  This is especially true in light of Plaintiff's assertion that she had no particular skill in
    Juvenile matters and had focused her career on seriously adult crimes, working with mostly adult
28  defendants; as a result, the assignment presented Plaintiff with more arduous duties – another factor
    creating a genuine issue of whether this assignment was "retaliatory."  (Coyne Decl. ¶ 40.)

08cv639

1    Public Defender branch.  (Coyne Decl. ¶ 40.)  Even though the Juvenile branch is the next closest

2    branch to El Cajon, it still increases her commute and makes it more difficult and lengthy for her

3    to get to her son in the afternoons.  (*Id.*)  The Public Defender was aware of this when he

4    transferred her and had previously withdrawn a transfer in 2006 for this very reasons.  (*See* Coyne

5    Decl. ¶ 7.)  Thus, it is a suitable question for a jury to determine whether, given Plaintiff's

6    vulnerability, this was a materially adverse employment action from which Plaintiff suffered harm

7    or injury.[5]

8        Accordingly, there is a genuine issue of material fact whether Plaintiff has suffered a

9    materially adverse employment action under the law, rendering summary judgment inappropriate

10   as to this issue.[6]  Plaintiff has adequately established her prima facie case of discrimination and

11   retaliation.

12   **II.    Has Defendant Proffered Legitimate, Non-Pre-Textual Reasons for Plaintiff's**

13   **         Transfer?**

14       Because Plaintiff has met her burden of proving a prima facie case of discrimination and

15   retaliation, the burden shifts to Defendant to proffer legitimate, non-discriminatory reasons for that

16   action.  *Flait*, 3 Cal. App. 4th at 476.  If Defendant does so, the burden shifts back to Plaintiff to

17   establish that these proffered reasons are pre-textual and the action was in fact discriminatory.  *Id.*

18

19       [5]  Defendant argues that Plaintiff cannot prove she was harmed by the assignment because

20   "[s]ince her 2007 reassignment, plaintiff has twice been anointed as one of San Diego's 'Super
     Lawyers' for criminal defense work according to an independent local publication. . . Ironically,
21   plaintiff never was named a 'Super Lawyer' before working at Juvenile Delinquency." (Reply to Opp.
     at 5-6; *see also* Supp. Ex. D, E; Pl. Depo. at 258-59.)  This argument is unavailing.  Whether Plaintiff
22   was professionally harmed as illustrated by any outside recognition is not the basis of her claim – her
     claim revolves around promotion within the department, the less-favorable work assignment, and the
23   difficulty of aiding her disabled child, not whether she was awarded "Super Lawyer" by an outside
     source.

24       [6]  Plaintiff asserts several other arguments in support of the transfer being a materially adverse
25   employment action from which she suffered.  The Court believes that the two arguments above are
     enough to defeat summary judgment on this issue, and thus declines to address the other arguments
26   proffered by Plaintiff.  There is also an issue of whether the Letter of Reprimand and other incidents
     constitute evidence of "ongoing retaliation" which may be considered by this Court as an adverse
27   employment action or actions or undeserved "negative evaluations" affecting reasonable promotion
     or delay of employment.  *See Akers v. County of San Diego*, 95 Cal. App. 4th 1441, 1454-57 (2002)
28   (finding that the jury could find that the negative evaluation of employee was undeserved and
     therefore retaliatory).  Again, the Court declines to address whether the Court may properly consider
     such incidents and, if so, whether they would constitute an adverse employment action or not.

1   As discussed below, the Court finds that Defendant has given legitimate justifications for

2   Plaintiff's transfer.  However, Plaintiff has met its burden of creating a genuine issue of material

3   fact regarding the pre-textual nature of these justifications, defeating summary judgment.

4        **A.**     **Defendant's Justifications**

5        Defendant offers two justifications for Plaintiff's transfer: (1) her inability to be present in

6   the El Cajon branches during normal working hours due to her son's needs and (2) the tension in

7   the El Cajon office between Plaintiff and her co-workers (namely, Mr. Lucero and Mr.

8   Richardson).  In response, Plaintiff contends that she was given several different reasons for her

9   transfer throughout the transfer process and continuing through this litigation.  These "shifting"

10  reasons, Plaintiff argues, are sufficient to establish that they are illegitimate and pre-textual.

11       Defendant first contends that the decision to transfer Plaintiff was "part of a broad

12  organizational restructuring of the Public Defender's Office made necessary by the fourteen new

13  DPD Vs promoted effective January 2007."  (Mem. ISO MSJ at 10; Carroll Decl. ¶ 11.)  Carroll

14  contends that the County approved the additional vacancies "contingent on" this restructuring

15  which would place senior attorneys in roles "commensurate with their class."  (Mem. ISO MSJ at

16  2; Carroll Decl. ¶ 11.)  The restructuring allegedly required each "adult" criminal branch to be

17  staffed with "three DPD V attorneys: one Supervisor/Branch Manager, one Assistant Supervisor

18  and one Senior Trial Attorney." (Carroll Decl. ¶11; Coker Decl. ¶ 8.)  Carroll testified that he

19  wanted and expected these three attorneys to be present during normal business hours.  (Carroll

20  Decl. ¶ 12(a).)  Thus, because Plaintiff had to leave the office around 3 p.m. every day (and earlier

21  on Wednesdays), Defendant argues she could not fulfill any of these three roles at the El Cajon

22  branch.  (*Id.*)  Instead, Carroll moved her to the geographically closest branch that offered her

23  flexibility in scheduling.  (*Id.* ¶ 16.)  Carroll asserts that, because the Juvenile branch is a "Direct

24  Calendar Court in which deputies are assigned to work in one courtroom," it is regarded as

25  permitting the most flexibility.  (*Id.*)  Thus, even though Carroll was not motivated by the desire to

26  grant Plaintiff flexibility, but because she could not fill one of the three roles in El Cajon, Carroll

27  was conscious of moving her to a branch that does.  (Mem. ISO MSJ at 11 n. 9.)  Moreover, by

28  transferring Plaintiff to the Juvenile branch, he was able to assign Plaintiff as a Team Leader,

1   which, though is not a supervisory role, is a leadership role which he believed Plaintiff desired.

2   (Carroll Decl. ¶ 16.)

3         The secondary reason motivating the transfer was allegedly the reports of friction in the El

4   Cajon branch. (*See* Carroll Decl. ¶12(b).)  "Both Bill Richardson, the branch Supervisor, and

5   Henry Coker, my Chief Deputy, had expressed the opinion that [Plaintiff] was involved with and

6   contributed to that friction.  Although [Carroll] did not have sufficient reason to blame [Plaintiff]

7   for the perceived friction, [he] recognized that it would be imprudent to ignore these reports. . . .

8   [T]here was a shared belief . . . that reassigning her away from the branch would improve work

9   relationships in that office."  (*Id.*)  The alleged friction was a result of the two incidents described

10  above: one involving Plaintiff and Mr. Lucero, El Cajon's Chief Investigator, and the other

11  involving Plaintiff and Mr. Richardson, the branch Supervisor.

12        The Court finds that these two justifications are, on their face, legitimate.  Transferring or

13  reassigning an employee in response to a business reorganization is a legitimate justification for an

14  otherwise adverse employment action.  *See Gibbs v. Consolidated Servs.*, 111 Cal. App. 4th 794,

15  799-800 (holding that modifying a workforce for business reasons is a legitimate justification).

16  The Court also believes that a plaintiff's disruptive behavior, and the employer's belief that a

17  transfer of that employee will result in less intra-office friction, is also a legitimate reason for

18  transfer.  *See Guz*, 24 Cal.4th at 358 (finding that the employer's "true reasons need not

19  necessarily have been wise or direct **. . . ,** the ultimate issue is whether the employer acted with *a*

20  *motive to* discriminate illegally.  Thus, 'legitimate' reasons . . . are reasons that are facially

21  unrelated to prohibited bias, and which, if true, would thus preclude a finding of

22  discrimination.**"**(emphases omitted)).  Thus, the issue becomes whether these otherwise legitimate

23  justifications were merely pretext for discrimination.

24        **B.      Are Defendant's Justifications Pre-Textual?**

25        Plaintiff asserts several theories for why the justifications proffered by Defendant are pre-

26  textual.  Plaintiff first argues that Defendant's explanations "shifted" over time, and that this

27  "shifting" in and of itself creates a genuine issue of material fact sufficient to defeat summary

28  judgment.  *See Payne v. Norwest Corp.*, 113 F.3d 1079, 1080 (9th Cir. 1997). Plaintiff also argues

1  that there is evidence, both direct and circumstantial, indicating that each of the justifications were

2  pre-textual in nature.  For the reasons stated below, the Court finds that there is a genuine issue of

3  material fact whether the justifications were pre-textual sufficient to defeat summary judgment.

4              **i.      Defendant's "Shifting" Explanations**

5          The Ninth Circuit held in *Lindahl v. Air France* that, "[s]imply because an explanation

6  comes after the beginning of litigation does not make it inherently incredible."  930 F.2d 1434,

7  1438 (9th Cir. 1991).  But, the Ninth Circuit has also held:

8          A rational trier of fact could find that these varying reasons show that the stated reason was
           pre-textual, for one who tells the truth need not recite different versions of the supposedly
9          same event. It may be that Norwest's shifting explanations are acceptable when "viewed in
           the context of other surrounding events."  *Payne*, 911 F.Supp. at 1310. However, such
10         weighing of the evidence is for a jury, not a judge. *See Abdul-Jabbar v. General Motors
           Corp.*, 85 F.3d 407, 410 (9th Cir.1996) ("We are not to weigh the evidence or determine
11         the truth of the matter, but only to determine whether there is a genuine issue for trial.")

12   113 F.3d 1079, 1080 (9th Cir. 1997).  Accordingly, Plaintiff's brief set forth a time-line

13  establishing various "shifting" explanations, arguing that this alone defeats summary judgment.

14         Plaintiff contends that the initial justification for her transfer was given on April 12, 2009

15  by Mr. Coker, the day before the public announcement regarding the transfers was made.  (Coyne

16  Decl. ¶ 18.)  The reason Mr. Coker allegedly gave Plaintiff for the transfer was that there was an

17  increased number of direct filings at Juvenile.  (*Id.* ¶ 19.)  Plaintiff protested to Mr. Coker, who

18  allegedly promised to speak to Mr. Carroll, but the transfer was made public the next day.  (*Id.* ¶

19  21.)  A few days later, during a meeting with Mr. Carroll, Mr. Carroll explained that the reason for

20  the transfer was "her special skills" and that she should meet with Mr. Mize, the Supervisor at

21  Juvenile, concerning her son's needs.  (*Id.* ¶ 24.)  Mr. Carroll states that Plaintiff told him that "she

22  regards herself as an expert in dealing with juvenile witnesses, making her well suited for this

23  assignment."  (Carroll Decl. ¶ 16.)  Plaintiff denies ever saying this and does not consider herself

24  as such at the time of the transfer.  (Coyne Decl. ¶ 32.)

25         The next justification according to Plaintiff occurred after Plaintiff began working at

26  Juvenile.  On September 17, 2008, Plaintiff requested to be returned to the El Cajon branch,

27  reminding Mr. Carroll of her son's disability and needs.  (*See* Coyne Ex. J, E-mail to Mr. Carroll.)

28  In response to this email, Mr. Carroll, allegedly for the first time, proffered the following

1    explanation:  "[W]e determined that an assignment in Juvenile Delinquency, with its direct

2    calendaring courts and non-jury trial form of litigation, would provide the work environment most

3    likely to assist you in seeing to your son's needs . . ." (Coyne Ex. K.)  The e-mail goes on to assert

4    that, because Plaintiff requires 14 hours away from the office during normal business hours, she

5    was not capable of filling any of the supervisory roles at the El Cajon branch.  (*Id*.)  Thus, this

6    "justification" amounts to restructuring the office while considering Plaintiff's special needs.

7         In between these correspondences, on September 18, 2008, Plaintiff filed her Complaint for

8    Retaliation with the Department of Fair Employment and Housing ("DFEH") and Equal

9    Employment Opportunity Commission ("EEOC").  (Coyne Exs. Q, S, T; Coyne Decl. § 31.)

10   Notably, these claims contained the first explanation: "My skills were needed in another

11   department."  (*Id.*)  Mr. Carroll stated in his deposition that he learned of the DFEH Complaint

12   when Internal Affairs sent notice it was filed, but does not recall when that was.  (Coyne Ex. HH,

13   Carroll Depo. at 96:18-24.)  Plaintiff presumably argues that this was prior to his September 25,

14   2008 e-mail offering the "new explanation" regarding the alleged restructuring and Plaintiff's need

15   for a flexible schedule and created in response to Plaintiff's complaint.  (*See* Opp. to MSJ at 9

16   ("Clearly appreciating there was no rational reason to move someone of Coyne's extraordinary

17   skills to a branch with no need for one of the country's best trial attorneys, Carroll now began to

18   develop a new series of requirements he would argue were justification for the transfer in the first

19   place.").)

20        The third and final justification was proffered after Plaintiff filed this lawsuit on February

21   29, 2008.  (Pl. Ex. A.)  Plaintiff argues that, only as of May 2009, in response to an interrogatory,

22   has Defendant claimed the transfer was caused in part by her disruptive behavior.  (*See* Pl. Ex. M;

23   Coyne Decl. ¶ 34.)

24        Defendant argues that it has not had "shifting explanations," but that the restructuring and

25   Plaintiff's inability to fulfill one of the tree supervisory positions in El Cajon was and always has

26   been its primary explanation for her transfer.  (Reply to Opp. at 7-10.)  Defendant also argues that

27   the original justification offered by Mr. Coker – the "increase in direct filings" – was not given by

28   Mr. Carroll (the ultimate decision-maker) and thus cannot be attributed to Mr. Carroll or

considered one of his explanations.  (Reply to Opp. at 7.)  The Court disagrees with both

assertions.  First, the Court finds that Plaintiff is entitled to assert Mr. Coker's justification as one

of the various explanations given to her.  Though Mr. Coker may not have been the ultimate

decision-maker, the record shows that he was involved in the decision by meeting and conferring

with Mr. Carroll as was one of three Chief Deputies (the next rung down from Mr. Carroll's

position as the Public Defender) (*See* Pl. Ex. HH, Carroll Depo. 20:20-21:20.)  The suit is against

the County, not Mr. Carroll.  Thus, this explanation is appropriately considered in the mix of the

alleged "shifting" explanations.[7]

Defendant has also not produced sufficient evidence to negate the time-line set forth by

Plaintiff.  Defendant contends that Mr. Carroll, from the day Plaintiff was informed of the transfer,

justified the transfer because of the restructuring.  But, there is no evidence in the record of this.

Instead, the record indicates that the first time Plaintiff was informed of this justification was in

September of 2008, though the transfer occurred in April 2007.  (*See* Pl. Ex. J.)  Thus, regardless

of when Mr. Carroll devised his plan of restructuring (which is in dispute), the record indicates

that this justification was not given to Plaintiff until *after* a different explanation was given by Mr.

Coker – this alone establishes that the justification "shifted" over time.  Additionally, the

justification regarding the alleged friction in the office came *after* the "primary" justification

regarding the restructuring.  Thus, Defendant has not defeated the time-line given by Plaintiff to

negate her argument that the justifications shifted over time.

Accordingly, the Court finds that Plaintiff has created a genuine issue suitable for the jury

based solely on the "shifting" of the explanations given to Plaintiff for her transfer.  However, the

Court need not rely on this alone, as there is a genuine issue of material fact whether each

justification itself was in fact legitimate or pre-textual.

_____

[7] Defendant also argues that "to the extent [plaintiff] purports to rely on Coker's explanation . . . it is undisputed that Coker was unaware of plaintiff's protected activity . . . Absent knowledge of a protected activity, Coker could not have been motivated by retaliatory animus . . ." (Reply to Opp. at 7; *see* Coker Decl. ¶ 10 (stating that he had never heard of the "Commission on the Status of Women" or that Plaintiff had "otherwise engaged in any type of protected activity supporting her female colleagues.")   This argument goes to whether the justification itself was motivated by a discriminatory animus, however, and not whether it is one of the many justifications establishing a "shift" which then creates an inference of pre-text.  Thus, this argument is irrelevant to Plaintiff's "shifting explanations" argument.

//

### ii.     Defendant's "Primary" Justification

Defendant's primary justification for the transfer is that it was pursuant to his pre-planned restructuring of the department and that Plaintiff's scheduling needs made it so that she could not fulfill one of the leadership positions created by the restructuring in the El Cajon branch.  Plaintiff asserts that there is no evidence of any pre-planned restructuring other than Mr. Carroll's statements regarding what he intended, circumstantially evidencing that no such plan existed prior to Plaintiff's complaints.  (Opp. to MSJ at 10.)  In response, Defendant points to his original memorandum to the County requesting the additional promotions to DPD IV and DPD V positions back on October 26, 2006.  (County Ex. 1.)  Mr. Carroll explicitly stated in this memorandum that he had "several reasons" for wanting to increase the number of senior-level DPDs.  (*Id.*)  Plaintiff argues that the primary reason was to tackle the growing number of more serious cases, *not* the alleged restructuring.  (Opp. to MSJ at 19.)  Defendant concedes that the primary reason was the increase in serious cases, but also points to the passage specifically regarding DPD Vs: "I wish to have 28 Grade V lawyers.  Twenty of these positions *will be leadership positions* bringing my span of control from 1:16 to 1:10." (County Ex. 1.)  Further, "[by having increased my Grade V staffing, I will be able avoid [*sic*] burnout and rotate people from litigation to supervision and still be adequately compensating my attorneys."  (*Id.*)

This memorandum, however, does not explicitly mention the existence of any plan to restructure, just that he wanted more DPD Vs in leadership roles – there was no mention of having three DPD Vs in these leadership positions, much less  that the plan would only happen at "adult" branches and that he wanted all DPD Vs to be present during normal business hours.  Thus, there is a genuine issue regarding when this plan came into existence; specifically, whether it was in response to Plaintiff's claims of discrimination and retaliation (implying pre-text).

Moreover, even if there was a pre-planned restructuring, Defendant's assertion that Plaintiff could not fulfill one of the positions in El Cajon raises genuine issues.  Plaintiff contends that she was "already acting as the de facto senior trial deputy without complaint or concern from her superiors."  (Opp. to MSJ at 10.)  Thus, because Plaintiff had been, in her opinion, the Senior Trial Deputy for nine years prior to the transfer, Defendant's assertion that she could not fill one of the roles required of a DPD V in the El Cajon branch is implausible.  (*Id.*; Pl. Ex. GG, Coyne

1   Depo. at 192:3-11; Coyne Decl. ¶ 27.)  According to Plaintiff, there is no evidence that this

position required the deputy to be present during normal business hours.  (Opp. to MSJ at 11.)

2   Plaintiff also argues that if the "disqualification" from this position was because of her family

3   needs, she would have been told this at the time of transfer and not five months after.  (Opp. to

4   MSJ at 20.)

5        In response, Defendant argues that, despite plaintiff's statements that she was "for all

6   intents and purposes" the senior trial deputy in El Cajon, "[i]t is undisputed that the 'senior trial

7   deputy' role *didn't exist* in this context until after the April 2007 transfers."  (Reply to Opp. at 4

8   (citing Carroll Decl. ¶ 11; Pl. Depo. at 192:13-22).)  Defendant argues that Plaintiff's subjective

9   view of her ability to fulfill the role is not sufficient to defeat summary judgment, citing *Bradley v.*

10  *Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996).  Defendant argues that this is

11  especially true given that Plaintiff testified that she had no idea what Mr. Carroll expected from

12  the senior trial deputy.  (Coyne Ex. GG, Coyne Depo. at 195: 16.)

13       In *Bradley,* the Ninth Circuit stated:  "Bradley claims she had been performing her job

14  adequately and had received no feedback indicating otherwise. However, an employee's subjective

15  personal judgments of her competence alone do not raise a genuine issue of material fact."  104

16  F.3d at 270 (citing *Schuler v. Chronicle Broadcasting Co., Inc.*, 793 F.2d 1010, 1011 (9th Cir.

17  1986)).  But, the key word in this quotation is *alone*: Plaintiff's subjective view she was capable of

18  fulfilling the role *alone* is not sufficient to defeat summary judgment.  However, there is other

19  evidence in the record indicating that Defendant's justifications are pre-textual.  Thus, *Bradley* is

20  not controlling.  Plaintiff's  views of her job performance prior to the transfer as it relates to the

21  restructuring is one of many factors that, when taken together, create a genuine issue sufficient to

22  defeat summary judgment.

23       In sum, the Court finds that there is a genuine issue of material fact whether this

24  restructuring plan, and Plaintiff's transfer pursuant to it, was legitimate or pre-textual.  Given the

25  time-frame of when the restructuring justification was given to Plaintiff and little, if any, evidence

26  that this restructuring was pre-planned, there is a genuine issue whether Plaintiff's transfer was

27  pursuant to any such broad organizational restructuring and not due to her support of the women's

28  discrimination claims.  Moreover, there is sufficient evidence regarding whether Plaintiff could not

fulfill one of the roles established by the alleged restructuring, further creating a genuine issue of

material fact of the pre-textual nature of the justifications.  Thus, Plaintiff has defeated summary judgment of this issue, as well.

### iii.     Defendant's Secondary Justification

Defendant argues that Plaintiff has produced no evidence that this justification was pre-textual.  The altercation with Mr. Lucero was documented in March 2007, months prior to the transfer and before she spoke at the Commission the Status of Women – the alleged protected activity.  (See Lucero Decl. Ex. A.)  Plaintiff, however, asserts that Carl Arnesen requested Lucero to formally document the two minor incidents "[w]ithin days of Coyne's public support," even if it was months prior to the Commission meeting.  (Opp. to MSJ at 3 (citing Coyne Ex. DD, Arnesen Depo. 15L3-16, 88:20-91:7.)  Plaintiff testified that prior to the winter of 2007, she did not have any difficulties with fellow counsel or staff.  (Coyne Decl. ¶ 12.)  Plaintiff therefore is arguing that the incident may have occurred and been documented prior to her statement at the Commission on the Status of Women, but that it occurred after those in the office knew of her opposition to the alleged discrimination.  (Opp. to MSJ at 21, Pl. Ex. X.)  Exhibit X is an email by Plaintiff to her fellow public defenders dated December 4, 2006 discussing the women's claims and that "our Union attorney indicated that the claims appeared colorable and merited further investigation." (Pl. Ex. X.)  The incident with Mr. Lucero was documented on December 7, 2006.  (*See* Lucero Decl. Ex. A.)  This formal documentation was made on account of Attorney Arnesen requesting that Mr. Lucero formally document the two minor incidents by e-mail.  (Pl. Ex. DD, Arnesen Depo. at 88:20-91:7.)  Mr. Arnesen was one of the attorney's involved in the decision to transfer Plaintiff.  (*Id.* at 15:3-16.)

The Court agrees with Plaintiff – the timing of the incident and its documentation is not reliant on its proximity to Plaintiff's speaking at the Commission of the Status of Women.  Though this may have been Plaintiff's most public support of the women's discrimination claims, there is evidence that Plaintiff made her support clear prior to this incident.  Thus, there is a genuine issue regarding whether Mr. Lucero being asked to document the incident was sufficiently proximate to Plaintiff's support to allow a reasonable jury to conclude that this alleged "disruptive" behavior was pre-textual.

Plaintiff further asserts that, if the reason for the transfer was her dissemination of the Order regarding Mr. Richardson, this itself is discriminatory or retaliatory because the

dissemination of the Order was in support of her allegations of sexual discrimination and therefore a protected activity.  (Opp. to MSJ at 12, 21-22.)  Plaintiff cites *Desert Palace, Inc. v. Costa* for the proposition that she proves her discrimination claims by proving that the protected activity itself was one of the motivating factors of the adverse employment action.  539 U.S. 90 (2003). Plaintiff further cites several cases which she asserts supports her proposition that he dissemination of the Order was a form of protected activity.

In *Crawford v. Metropolitan Gov't*, the Supreme Court held that an employee's disclosure of an unlawful practice amounts to that employee "opposing" such practice.  129 S.Ct 846, 850-51 (2009).  This is true even if the disclosure was involuntary such as in response to an internal investigation.  *Id.* at 851.  The Fourth Circuit in *Armstrong v. Index Journal Co.* similarly found that, in Title VII cases, "[t]he opposition clause has been held to encompass informal protests, such as voicing complaints to employers or using an employer's grievance procedures."  647 F.2d 441, 448 (4th Cir. 1981).

Plaintiff contends that her complaints regarding Mr. Richardson's promotion and other "favorable treatment" were "complaints or protests to an employer," as described in *Armstrong*. There is no rigorous requirement in determining what constitutes "opposition" in Title VII retaliation claims.  *See EEOC v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1013 (9th Cir. 1983). Consequently, Plaintiff argues that her "distribution of information concerning Richardson's serious errors" was to illustrate that Mr. Richardson's promotion and selection for positions which Plaintiff also sought were a result of gender discrimination (considering these "serious errors" did not affect Mr. Richardson's abilities to be promoted/selected).  (Opp. to MSJ at 23.)

Defendant argues in response that the evidence (including Plaintiff's own testimony) does not support Plaintiff's assertion that the dissemination was to protest sexual discrimination, but instead was to express her belief in Mr. Richardson's incompetence and undermine his authority. (Reply to Opp. at 6.)  Plaintiff herself testified in her deposition that she offered her colleague a copy of the order "[b]ecause of [her] frustration with Mr. Richardson's incompetence . . ."  (Pl. Depo. at 288:11-12.)  She further testified that she believed that Mr. Richardson's errors were a "teaching moment."  (*Id.* at 314: 14-23.)  Notably, however, in this same breath Plaintiff stated that she did not disseminate the Order to "undermine" Mr. Richardson and that she did not "believe that teaching from others mistakes is undermining.  (*Id.* at 314: 7, 14-16.)

Defendant also asserts that the other public defenders did not perceive Plaintiff's actions as a protest against discrimination.  Mr. Coker declared that he only regarded Plaintiff's conduct as an example of her "undermining Bill Richardson's authority" and that he did "not believe there is any reason for [Plaintiff] to distribute the Order, other than in an attempt to embarrass Mr. Richardson."  (Coker Decl. ¶¶ 6, 7.)  Moreover, Mr. Carroll, the ultimate decision maker, reported only knowledge of friction, not that the friction arose from the distribution of the Order.  Thus, the alleged friction could have been a response to the incident with Mr. Lucero and Mr. Carroll acknowledges that he did not blame Plaintiff for the friction (just that he could not ignore such reports.)  (Carroll Decl. ¶ 12(b).)

Defendant also argues that, even if the dissemination of the Order was in protest of discrimination, "Courts have long instructed that not every opposition to perceived discrimination is protected: the opposition 'must be directed at an unlawful employment practice . . . [and] the means of opposition chosen must be . . . reasonable in view of the employer's interest in maintaining a harmonious and efficient operation." (Reply to Opp. at 6 n.4 (quoting *Silver v. KCA, Inc.*, 586 F.2d 138, 141 (9th Cir. 1978)).)

Based on the above arguments, the Court finds a genuine issue of material fact sufficient to defeat summary judgment as to whether this secondary justification is a pretense to discrimination. The record is not clear for what purpose Plaintiff was disseminating the Order – either to protest discrimination or to undermine and embarrass Mr. Richardson.  In truth, it could have been both. Plaintiff clearly felt Mr. Richardson was not competent in his position as branch Supervisor and there is, in my opinion, sufficient evidence to link these complaints about Mr. Richardson with her allegations of gender bias within the office.  Moreover, that the incident with Mr. Lucero occurred is essentially undisputed.  This incident alone may be the cause of the reported "friction" sufficient to justify Plaintiff's transfer, even if the incident regarding Mr. Richardson is an illegitimate justification.  But, given Plaintiff's valid argument for why these reports of "friction" were pre-textual and made only after her support of the other women not promoted, along with the genuine issue of whether the incident with Mr. Richardson was protected activity, this question is suitable for the jury, not the Court.   Thus, Plaintiff has defeated summary judgment based on the possible pre-textual nature of this justification as well.

//

**III.     Conclusion**

In conclusion, the Court finds that the record shows that there is a genuine issue of material fact sufficient to defeat summary judgment.  First, Plaintiff has offered sufficient evidence that she has suffered a materially adverse employment action, and suffered harm as a result, based on the transfer alone.  Second, though the Court finds that Defendant has met its burden of providing legitimate justifications for its actions, Plaintiff has met its burden of establishing a genuine issue regarding that pre-textual nature of these justifications.  The Court finds that Plaintiff has offered sufficient evidence that the Defendants' justifications shifted over time, creating a genuine issue of fact more suitable for the jury than the judge standing alone.  Further, the Court finds that Plaintiff has met its burden of proving a genuine issue of material fact whether these two justifications themselves were pre-textual.  Thus, the Court **DENIES** Defendants' motion for summary judgment.

**IT IS SO ORDERED.**

DATED:  December 21, 2009

_Janis L. Sammartino_
Honorable Janis L. Sammartino
United States District Judge

08cv639